all the first case. It's number 13 12 33. Or are you in last 15 minutes? Your Honor's may please the court. Linus Bang Heartland, Assistant Attorney General for the state of Michigan, on behalf of the respondent warden, respectfully requesting that this court reverse the decision of the district court granting habeas relief. And may it please the court, I will request two minutes for rebuttal. Your Honor, the district court in this case failed to appropriately apply the highly deferential standards of review that apply in this case. In reviewing the decision below, this court should do what the district court failed to do, which is to place itself, and I'm addressing the deficiency prong here of Strickland first, which is to place itself in the shoes of the attorney at the time the strategic decision was made not to object to the interview statements. This is something the district court didn't do, used hindsight to look at, well, the effects that it had by being used by the prosecution, by being used in the closing argument. This court needs to recognize that the attorney, the defense attorney in this case, was faced with what is essentially a trilemma, which is to say, I could put my client on the stand, assuming he's willing to testify, subject him to cross-examination, and in my opinion as a defense attorney, that's not going to go well. I could get the statements excluded and not call him on the stand, and then leave the jury wondering, well, other than sort of the brief interview with Detective Mills, wondering why aren't we hearing the defendant's side of the story, which in my view as a defense attorney is not something I want the jury to wonder about. Or, I could get these interview statements made, the statements that were made in the interview, not object to them coming in, and say, now we can get all of these denials in, not only denials, but denials that were made when my client was in a weakened state, when my client was in the hospital on drugs, and say, look, even under all this pressure, my client consistently and clearly denied it. Get that in front of the jury, I've got a reasonable trial strategy, and particularly reasonable in light of the limited options that were available to defense counsel at the time, which is why defense counsel said, pre-trial, not in front of the jury, and I have to correct that mistake in the appellee brief, not in front of the jury, and not in closing argument, pre-trial said, and this isn't a quote, it's a paraphrase, but there's all these interviews that are going to come in, I could object to it because he was in the hospital on drugs when he made it, and I'm not going to object to it because I want it all to come in. I thought there was a statement by the defense counsel that he thought it would be futile to make an objection. There was one statement made by defense counsel, which was in the motion for a new trial, the supplemental motion for a new trial after the trial court ordered him to brief his own ineffectiveness, in which he said, I initially believed that I couldn't keep it out because there was no confession, and that's the same error of law that the Michigan Court of Appeals made. There was no statement saying that that was the reason he didn't object. He just said, I initially believed that. Well, initially, meaning when he first started to look at the case and develop strategies, initially, at pre-trial, initially, we don't know when. What there was missing is any statement that that was a reason for his failure to object. The only reason we have is the contemporaneous reason he gave pre-trial, which I just said, which is I want it all to come in, even though I could make a motion, and then also in the arguments on the motion for new trial, which the court below sort of stitched together statements and sort of made a patchwork of admission that it was this error of law, and it's not the case. What he was saying, when he said in argument, there was no confession here, right? There was only denials. That doesn't mean that as a matter of law, voluntariness isn't the issue. What he means is, this is not a disadvantage for my client. It plays into my strategy of A, showing he consistently denied it, and B, the other trial strategy, which is reflected in the defense's closing argument, which is police overreach. Police that he was, that Sergeant Proudfoot was single-minded, determined he was persecuting my client. He never looked at other suspects. He never seriously considered it was an accident, right? And that is also the defense strategy. So we've got two defense strategies. The one which I outlined, get the statements in without cross-examination. The other, which is reflected in closing argument, which is show how determined the police were to get this guy that they just ignored other theories. And you can get them both in by getting these interviews and allowing them in, and you don't get any clearly inculpatory statements. And then further, you can reduce the damage, mitigate the damage done by the inconsistencies with the physical evidence by saying, well, yeah, there were some inconsistencies. He was on drugs, he was in the hospital, and he was confused. He was confabulating, right? You got all that testimony in, the confabulation, the weakened state, these drugs, all that got in front of the jury. So you mitigate what little damage there is to be done, you mitigate it, and you get in your theory about the police and your denials. And you say, look, even when the police wanted it, even when he went in for the kill, and this is language, again, not a direct quote, but this is language from closing argument, he didn't get the kill. He went in for the kill and he didn't get it. Given the position that defense counsel was in, where you've got a fire, you've got very strong evidence that the fire was not accidental, you've got two people in the house, one of them was dead, can you argue suicide? You can, but then we'd be here on that ineffective assistance of counsel claim that he argued an implausible suicide theory. The only other person who had access to the house is Frederick Spencer. You're in a tough situation. The district court says that without these statements, the prosecution's case was weak and circumstantial. Well, circumstantial, yes, but circumstantial isn't a synonym for weak. This was not weak evidence. You've mentioned the arguments for strategy, and you've mentioned specifically the closing argument as the place where the defense counsel showed his strategy. Is there any other place in the record that you would point us to to show that this was, in fact, a strategy of the defense counsel? Yes, Your Honor, and as I said earlier, pre-trial, not in front of the jury, when they're talking about getting these statements in, when he says to the judge. I should have been more explicit. Is there any other part of the trial where you can see the defense lawyer's strategy operating through explicit statements of the defense lawyer or questions of the defense lawyer or actions of the defense lawyer other than allowing the admission of this evidence? Oh, yes, the cross-examination of Sergeant Proudfoot where he develops this theme that is later in closing argument, where he develops this theme of you didn't explore other suspects, you didn't explore other avenues, etc. That all ties into the theme of police overreach, single-minded persecution of Mr. Spencer. And I'm going to move now to the prejudice prong. Now, in this case, Spencer will have to show that both that there was a reasonable probability that these motions to suppress would have been successful and that if the statements had been suppressed, that it would have made a difference to the outcome of the case. Do we review that prong or the other prong de novo? Under a binding Sixth Circuit precedent, that's reviewed de novo. And just to make the record, because this is something we've brought up to the Supreme Court before and they've denied it, the state believes that that's an incorrect, that those cases were wrong. We decided under Harrington v. Richter, but the state concedes that under binding Sixth Circuit precedent, it is reviewed de novo, Your Honor. But even under de novo standard, Spencer can't make either showing with respect to the court below. First of all, a crucial element in showing that a statement can be suppressed as involuntary is police coercion, police coercive activity. And it's just not present. You just don't see it. And you see and you look at the cases, and there's a case, a U.S. Supreme Court case in particular, Colorado v. Connolly, which in turn cites other cases where you see police coercive activity, where you see, and it's similar to Miranda cases, except they're different because there's no custody. But you see the length of interrogation, you see the tactics used, etc. And here you've got the nurse gives permission, right? The nurses, I understand, thought that this was going to be some kind of helpfulness to... That may be, Your Honor, but I'm talking about from the point of view of the police in terms of what the police were doing. The police officer sought permission and received permission. And I don't think there's any reason to think that the police officer tricked the nurse. If the nurse was operating under a misunderstanding or if the nurse... You don't think there's any evidence that the police misled the nurse? None comes to mind, Your Honor. If there is some, I'm not aware of it. But a family member was in the room. The interview was not extraordinarily lengthy. If you look at the tone, and especially with the February 10th interview where there was no... where Spencer wasn't even a suspect at the beginning of that interview, right? And it is not confrontational. And further, what coercion could there have been when... I mean, the court would have to accept the idea that Proutfoot went in there with the idea of coercing specific lies from Spencer so that then he could use the inconsistencies with the physical evidence to show that he's lying, and it doesn't make sense. You'd have to... I'm going to coerce Spencer into saying that the gas can was here, and then I'm going to show that the gas can was there, and there's no evidence in the questioning, and it's frankly an implausible theory. If he was trying to coerce a confession out of him, well, again, one of the crucial elements to suppress this as involuntary is that the police overbore the will of the suspect. Well, then where's the confession? And I have to clarify, because this was a statement, maybe a misunderstanding in the Apolli brief. The State isn't arguing, has never argued, that the fact that there was no confession means the voluntariness analysis is irrelevant, and of course that's the mistake the Michigan Court of Appeals made. But the fact that there was no confession is relevant in showing that the police didn't overbear the will of the suspect. In this weakened state, and again, this is the argument that he made before the jury. In his weakened state, on drugs, in the hospital, the police wanted a confession, there was no confession. Now, which brings up another point. In the prejudice analysis, the district court said, well, there's no evidence so strong as a confession. The language from Arizona versus Fulminante, if I'm not mistaken. Well, there was no confession here, so I think that certainly weakens the district court's prejudice analysis. If you say... I thought that there were negative aspects to the information that Spencer gave during the February 10th and February 12th interviews. The only thing that was inculpatory about it is the inconsistency with, well, two things. The inconsistency with the physical evidence. So that means there's nothing inherent in the statements that was inculpatory, but the fact that it later turned out not to jive with the physical evidence. So I don't really understand your point, then, that he didn't give a confession. He's making statements and saying things or not saying things that are hurtful to him in the end, right? Hurtful in the end, arguably. So police coercion could well cause that kind of a thing to happen. Your basic point should be that there wasn't any coercion, not that the statements weren't confessions. Well, it's both points, because Spencer has to show both that the motion would have been successful, to which it is relevant to say that there was no police coercion, which is part of the point, and also to show that if the statements had been suppressed, it would have made no difference to the outcome of the trial. And to that analysis, it is relevant to say that there was no confession. However, there are other things that could be hurtful than confessions. Certainly. Yes, Your Honor, and of course the prosecution did use these inconsistencies, and the argument is that the prosecution used it to their advantage. But the point is that when the district court says, well, of course this is prejudicial because confessions are so prejudicial, it throws the district court's reasoning into doubt, because how can you say, well, this is prejudicial because confessions are prejudicial when there was no confession? That reasoning doesn't, respectfully, it doesn't make sense, Your Honor. And if there are any other questions, I'd be glad to answer them. Thank you, Your Honor. There are not. Thank you, Counsel. Thank you. David Moran from the University of Michigan Law School Michigan Innocence Clinic. I'm joined by co-counsel Imran Syed and student attorney Kyle Hamilton on behalf of Mr. Spencer. Let me turn to the last points that Mr. Benghart Lynn made first about can this be an involuntary confession or an involuntary statement when there was no confession. The basic error that Mr. Benghart Lynn makes is the test for involuntariness is not police coercion. It's police overreaching. That's the test from Colorado v. Connolly. That's why we have Arizona v. Mincy, which is a case very factually similar to this one in which you have the police interrogating a badly injured and drugged man in a hospital room while he's attached to various equipment, and the U.S. Supreme Court finding that the resulting statements are involuntary. It's taking advantage of a person in a weakened state like Mr. Spencer was. The district judge had an opportunity to listen to the tapes. We have submitted the tapes of the interrogations. Anyone listening to those tapes would understand that Mr. Spencer was being taken advantage of, and his statement was therefore involuntary because the test is not whether his will to confess is being overborne, but whether his will to speak at all is being overborne. And he was not in a state where he could rationally choose whether or not it was in his interest to speak to Detective Proudfoot, much less formulate his answers in a coherent and rational way that would not make him sound years later to a jury as a guilty man. Now, Arizona v. Mincy, I should add, is not cited anywhere in the state's brief or in the state's reply brief, even though both the district court and we rely very heavily on it for the proposition that this is coercion. Now, as for the last part of the prejudice prong about the impact on the case, I can't do any better than quoting from the trial court. When the trial court issued its order denying the new trial motion, the trial court said, and I quote, all of the evidence against Mr. Spencer is circumstantial, but the bulk of the prosecution's evidence stems from defendant's statements that he made in St. Mary's Medical Center on February 10th and 12th, 2000. When matched with the physical evidence, a rational trier of fact could conclude that defendant was lying and then infer from the lies the defendant was attempting to cover up the commission of the crimes he was convicted of, end quote. It's not just the district court who looked at this and said, the most important evidence against Mr. Spencer is the statements he made in the hospital bed. It's the trial court as well that presided over the entire trial. Indeed, the prosecutor understood that. One glance at the closing arguments in this case, if you were just to randomly put your finger on a page of the closing arguments in this case, the chances are very good, probably something like 2 to 1 or 3 to 1 or 1 to 2, 1 to 3, that you will hit upon the prosecution attacking Mr. Spencer for the statements he made while he was on Demerol, Haldol, Tylenol with codeine being interrogated by Detective Proudfoot on February 10th and 12th, 2000. The prosecutor is in the best position of all to know how important these statements were to the case, and so the prosecutor listened to the statements, understood they were devastating because they were all over the place. They were inconsistent with each other. They were inconsistent with the physical evidence at the scene. And as the prosecutor repeatedly stressed, the most devastating thing at all for Mr. Spencer was that he was not firmly denying setting the fire strongly enough. He never admitted setting the fire, but the prosecutor kept arguing to the jury, does that sound like an innocent man? When confronted with this direct accusation on February 12th that he started the fire that killed his girlfriend, why isn't he telling the detective to get lost? Why aren't these jury questions that the trial counsel would present to the jury and say, hey, my client was on Demerol and Haldol and so forth, and you can tell that he's not rational, he's made these obviously crazy statements due to being on drugs, so really the statements of February 10th and February 12th are irrelevant and should not be held against my client? That's what trial counsel did, Your Honor, after he failed to move to suppress the statements. So it has never been our claim that trial counsel was ineffective in how he dealt with the statements once they came in. The ineffectiveness was not trying to exclude the statements in the first place. Much of what Mr. Bangheart Lynn describes as strategy is mitigation. He is attempting to mitigate the damage from the admission of these statements by making sure the jury understood that his client was not in his right mind. But that leads me then back to the question of whether this was strategy. And I turn back to the trial court, first of all. Again, we don't have to go to the district court. We can go all the way back to the trial court, and on page 6 of the order denying the motion for new trial, the trial court says first that the defense attorney made his decision because he believed erroneously that he could not exclude statements that were short of a confession, and he actually says this is an error of law. So both based on the written motion that trial counsel had filed post-trial and the hearing post-trial, the trial court understood that defense counsel was saying, I didn't file the motion because I thought I couldn't exclude something short of a confession. Then the next paragraph, the trial court says, and this was a strategic decision, and the district court, in the opinion granting the habeas, correctly calls the trial court on that. It can't be both. You can't make a strategic decision based upon an error of law that leads you to believe that a motion to suppress will be futile. And so once the decision was made I can't get them suppressed probably because trial counsel had read People v. Gist, the same erroneous Michigan Court of Appeals opinion that the panel relied upon, the Michigan Court of Appeals panel, relied upon in this case to deny relief. Once trial counsel had made the erroneous decision that I can't get these statements suppressed as a matter of law, then as a good trial counsel he starts thinking, well, what can I do with these statements? And he starts coming up with ways to try and mitigate the damage. And I want to explain why none of these reasons, even if we assume counterfactually to what the trial court found, the state trial court, even if we assume counterfactually this was a pure strategic decision, it would not be an objectively reasonable strategic decision. Indeed, it would not be a reasonable decision even under the double deference that the district court appropriately applied to the trial court's decision in this case. Let's look at the strategic reasons one by one. The first strategic reason claimed is that it gives a great opportunity to attack Detective Proudfoot for conducting an interview on a helpless man. But counsel could do that, assuming he made a motion to suppress and it was granted. He could do that anyway. He didn't have to admit the statements in order to show that Detective Proudfoot took advantage of him. He could elicit testimony from the nurse. He could elicit testimony from Mr. Spencer's sister, Corrine, during the February 10th interview, to show that Detective Proudfoot went to the hospital, misled the nurse as to his true objective, hid a recorder in his pocket, and then conducted an 80-minute interview with a man who had been drugged. Again, all of that he could get out to the doctors and the nurses and the hospital records, and then came back and did it again two days later when Mr. Spencer was even worse shape, 20 minutes after receiving an injection of Demerol, one day after receiving a very serious operation. So he could have brought all of that out without admitting the statements. The U.S. Supreme Court in Arizona v. Fomenanti has said that you don't open the door for involuntary statements. The statements are inadmissible for all purposes, including impeachment. Well, what would he have been cross-examining on that would have provided him the opportunity to bring all that out? Well, when Detective Proudfoot testified, then the defense counsel could have said, You went to the hospital, sir, didn't you, on February 10, 2000. You knew about the state that my client was in. You attempted to interrogate him for 80 minutes. You misled the nurse. But that would be against the backdrop of the jury not having the hospital records. So he would be suggesting to the jury that there's something that Proudfoot uncovered, and they wouldn't know what that something was unless Proudfoot was to testify to what took place during that interview. I don't believe so, Your Honor, because I believe what defense counsel could do is get a limiting instruction that Proudfoot would not be allowed to mention that he obtained any statements from Mr. Spencer, only that he attempted to interrogate Mr. Spencer, and that the defense counsel could question him about the circumstances, and then bring in the doctors, the nurses, Corrine and Spencer, in order to establish Mr. Spencer's weakened state. But if I'm sitting on the jury and I'm listening to him say, You did this and that, and he was in a weakened condition, my response would be, So what? What's that got to do with anything? Well, according to the state, I agree, Your Honor. I agree so what. But according to the state, this was the grand strategic decision that defense counsel made to show that Detective Proudfoot was a bad guy. What I'm suggesting is that if the defense actually had a strategy of trying to show that Detective Proudfoot was a bad guy, they didn't need to admit the statements to do it. They could do it simply by showing what he did without admitting the almost 3 hours of incoherent, self-contradictory, and rambling statements that I hope you'll listen to, if you haven't listened to already, on the tapes. I don't think any competent defense lawyer could listen to those tapes and think it's a good idea to have these statements come in so that I can show Detective Proudfoot is a bad guy. The second reason, linked to the first one given by the state as for why this was a valid strategic decision, is it gets Mr. Spencer's exculpatory denials before the jury without putting him through the crucible of cross-examination. True enough, but Mr. Spencer's exculpatory denials were already coming in through his statement to Officer Mills or Detective Mills, and that was never denied. And if, for some reason, you were to buy the state's argument that Detective Mills' statement isn't enough, it's actually quite comprehensive, it goes through the facts in a coherent, rational way as to what Mr. Spencer has all along said happened, except when he was under the influence of drugs, you would never want to admit, if you listen to the tapes, you would never want to admit these statements as the form of exculpatory denial, for the very reasons that the prosecutor hammered on over and over again throughout closing and opening statements, that they're inconsistent, that he doesn't strongly deny having killed his girlfriend, and so forth. The final reason that the district court correctly seized on as to why these statements can't be seen as a reasonable exercise of strategy not to try to suppress is that if they had been suppressed, then there essentially would have been no case against Mr. Spencer. As defense counsel himself put it in the motion hearing post-trial, there was no downside, that's an exact quote, there was no downside here. You can try to move to suppress, and the failure to suppress, if the motion had been denied, would have in no way prejudiced his trial strategy. If the motion, on the other hand, was granted, going back to the quote from the district court, it was the bulk of the prosecution's case. The prosecution had a very weak case, that this was an arson in the first place. The prosecution or the state claims in its opening brief that this was a case of undisputed arson. It's patently false. Much of the trial was about whether this was an arson at all or whether Detective Proudfoot, who had received his arson certification less than two years before, was even competent to read this fire at all. So much of the trial was about, was this arson? But even beyond that, even if there was a sliver of evidence beyond which a rational jury could find beyond a reasonable doubt that there was an intentional fire in this case, could a rational jury have found beyond a reasonable doubt that Fred Spencer was the arsonist without these two hospital statements? And I submit that the answer is no. You have Kathy Sytek, the woman who died. She could have set the fire accidentally or intentionally. But you have Mr. Spencer, and then you have the possibility of a third party. Now remember, there were two fires in this case. There was a fire February 18, 2000, that the jury acquitted Mr. Spencer of after he presented strong evidence that he couldn't possibly have started that fire because he was on his way back to Sheppard from Saginaw during a blizzard where he'd been released from the hospital just 80 minutes before this fire had started. And an eyewitness had seen what appeared to be a tall woman who he said was definitely not Mr. Spencer in the house or the remains of the house just before the fire started. The prosecution started this trial by saying, for sure, the same person would have started both of these fires. And so contrary to Mr. Bancart-Linn's claim, we have the entire universe of third persons as well, including possibly the tall woman who was seen in the house just before February 18. So without the inculpatory statements, and I'm saying inculpatory statements but not confessions, the prosecution essentially had no case that Mr. Spencer was the arsonist. All they had was two out of six responders said that Mr. Spencer smelled like petroleum product, four others said he didn't, and that was, as the district court and the trial court both noted, easily explained by the fact that Mr. Spencer was a mechanic and neighbors testified he often smelled like oil and gasoline. Does the record clearly reflect that the trial judge was of the opinion that this statement was not suppressible because there was no confession? No. The trial judge was of the opposite opinion. The trial judge said that the trial lawyer, Mr. Barberry's explanation, was error, which is surprising to me because there was Michigan law, Michigan Court of Appeals law, going the other way. But apparently the trial judge was aware that that view of the law was erroneous in light of federal precedent. The Michigan Court of Appeals continued to be of that view. Unfortunately true, Your Honor. For all these reasons, we believe that Judge Duggan got it right and he got it right giving all of the deference, if not more than the deference that it requires to the state court's decisions in this case. Thanks very much. Thank you, counsel. Thank you. And just a few brief points. The last points first. The fact that there are other theories of defense doesn't mean that the evidence without the statements was insufficient. That's not a question of insufficiency, and of course it's subtle law. The prosecution is not required to disprove all possible theories of defense. There was sufficient evidence without the statements. On the point about why not just get this in without getting the interviews in, but just cross-examine Detective Proudfoot on his overreaching without bringing it in. And I think there are two responses to that. First, as Judge Guy, as you brought up, you say, so what? And my brother agrees, so what? Well, unfortunately, under the Michigan Rules of Evidence, evidence has to be relevant to be admissible. So if the correct answer is, so what, then the evidence can't come in. But there's another point, and I would analogize this to a case where the prosecution wants to bring in evidence. Let's say there's a murder, and they want to bring in the medical examiner to show the bullet wounds and how they went through, et cetera. And the defense side says, well, we'll stipulate that the shooting was the cause of death. And the prosecution says, no, no, no. You've pled not guilty, you've put the elements in play, and I'm going to bring in this evidence, right? Because it's more evocative, it paints a picture for the jury. And it's the same thing, the other side of the coin, with this case. You can say, well, you can just give the jury just this sort of cold, well, the police went there, he was in the hospital, he was on drugs. Or you can let them listen to the confused, crazy sort of ranting statements he made in the hospital. And you can say, look how bad this is, right? It really actually shows it, rather than just a cold statement from Proudfoot on cross-examination. And Judge Morris, as you, I think, noted in your question, the sort of weirdness and craziness of the statements, those are not issues of voluntariness for admissibility. These are issues of weight and credibility for the jury. And both sides decided to use these interviews to put this question to the jury, one to show overreaching and the other to show inconsistencies. The fact that it didn't work is not evidence of deficient performance. Can you address the Arizona versus Mincy case? I'm sorry? Can you address the Arizona versus Mincy case? Yes, Your Honor. And in fact, Mincy, the facts in Mincy are much worse. And Connelly as well, and the cases cited. I mean, I would absolutely invite the court to compare the facts in this case with what the investigator did with what happened in Mincy. And they're just in no way comparable. So you're distinguishing that case simply on the basis of the facts, but you would agree that the legal principles apply. Well, I would point out the legal principle. Well, one of the legal principles is, if I'm not mistaken, that police coercion is a factor, or police overreaching, police coercion, police misconduct. And I believe that applies as well. But yeah, I mean, clearly there are some cases where interview tactics can beat police overreaching and police coercion. And there are other cases where it's not. And Mincy was one where it was. And this is one where it's not. I mean, all of these cases are fact-specific inquiries. Your Honor, I don't think there's any black or white sort of bright line rule. But one bright line rule is there has to be police coercion. But as far as whether you find that, you have to look at the facts of the case. And so I would absolutely invite comparison with Mincy, comparison with Connolly, and some of the cases cited in Connolly. If defense counsel was mistaken as to the role that a lack of confession played in all of this, doesn't that go a long way to undermine his strategy? If defense counsel believed that,  then it would, Your Honor. But the fact that he wanted these statements in makes it irrelevant whether he believed there was a legal basis to keep them out. If you want something in, if you want evidence in, then you'll want it in whether it's excludable or not excludable. Well, but you can turn that on its head and say the fact that he thought he couldn't keep him out was what caused him to develop a strategy on how to deal with them once they came in. Yes, Your Honor. And if that were the case, if there were evidence showing that that were the case. But again, Strickland commands this court to indulge a strong presumption that this was trial strategy. And so to do what the lower court did and sort of stitch together statements where it doesn't establish this and say, well, maybe this was what trial court did, or excuse me, the trial counsel did, is start off with this mistake of law and then build the strategy around the mistake of law. Well, that's all speculation, and it goes absolutely against the deferential standard of Strickland. So you do not concede that that statement from counsel that he initially thought that he couldn't get them suppressed was a statement that indicated his legal basis for proceeding? Correct, Your Honor. We don't concede that there was no statement that trial counsel made that connected that erroneous belief with his decision. And the statement in the motion sort of stands on its own, unconnected with anything. And now, is it possible? Perhaps it's possible. But again, given the strong presumption commanded by Strickland and his contemporaneous statement pretrial, not in front of the jury, saying I want this all to come in because it supports my trial strategy, the presumption has not been overcome, Your Honors. Thank you, counsel. Thank you, Your Honors. The case will be submitted.